**In re Gary SKEEN and Nancy Skeen, Debtors.**

No. 99–22891.

United States Bankruptcy Court, E.D. Tennessee.

May 5, 2000.

Dean Greer, Kingsport, Tennessee, for Gary and Nancy Skeen.

Douglas L. Payne, Greeneville, Tennessee, for City Finance Company.

### *MEMORANDUM*

MARCIA PHILLIPS PARSONS, Bankruptcy Judge.

This chapter 7 case came before the court for hearing on February 22, 2000, upon the debtors' motion to determine whether City Finance Company has willfully violated the automatic stay provisions of the Bankruptcy Code and City Fi-

nance's response to the motion. The court having determined that the violation was not willful and that the debtors suffered no injury as a result of the violation, the motion will be denied. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(O).

## I.

On November 18, 1999, the debtors commenced this case by filing a voluntary petition along with the requisite schedules and statements. Listed in their *Schedule D* was an obligation to City Finance in the amount of $1,500, secured by a china hutch with a stated value of $400. The debtors indicated in their statement of intention a desire to "reaffirm for fair market value" the City Finance obligation. City Finance was provided notice of the bankruptcy filing when a copy of the "Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines" was served by first class mail on November 21, 1999.

On December 27, 1999, City Finance moved for relief from the automatic stay in order to proceed with repossession of the china hutch, asserting that the debtors did not have equity in the property and that it was not needed for an effective reorganization. Because no objection to the motion was filed, an order was entered on January 20, 2000, granting the motion for relief pursuant to E.D.Tenn. LBR 4001–1(b).[1]

On January 18, 2000, the debtors filed the motion to determine whether City Finance violated 11 U.S.C. § 362(a) which is presently before this court. In the motion, the debtors assert that after the bankruptcy filing, employees of City Finance made two telephone calls to the debtor Nancy Skeen demanding payment and threatening repossession if payment was not forthcoming. The debtors allege that these phone calls were intentional violations of the automatic stay for which they should be awarded both compensatory and punitive damages. In its response filed on February 8, 2000, City Finance acknowledges that one telephone call was made to the debtors, but alleges, *inter alia*, that the call occurred prior to receiving notice of the bankruptcy filing and that it was not harassing.

At the hearing, Mrs. Skeen and two City Finance employees testified. Mrs. Skeen stated that she purchased the china hutch last summer from an antique store by paying $300 down and placing the hutch in layaway. At the end of ninety days, Mrs. Skeen was told that she could finance the remainder of the purchase price through City Finance in Kingsport which she did. Mrs. Skeen testified that after the purchase she made one to three payments to City Finance, but could not recall the exact number. Thereafter City Finance began telephoning her regarding payment arrangements although repossession was never threatened.

Mrs. Skeen testified that sometime around the first of December, after Thanksgiving and a week, two weeks, or three weeks after she had received notice of her bankruptcy filing from the clerk of the court, she came home and entered *69 on her telephone to discover who had called while she had been out. Mrs. Skeen stated that she was concerned that her minor son might have been trying to get in touch with her from school. Entering *69 resulted in a telephone call being placed to City Finance since its call had apparently been the last incoming one to the debtors' residence. Mrs. Skeen testified that when a "Melissa" or "Michelle" answered the call at City Finance, she informed the City Finance representative that she had filed for bankruptcy relief and provided the name of her attorney. The employee thanked Mrs. Skeen for the information and that was the end of the conversation.

Mrs. Skeen testified that ten to fifteen minutes after this conversation, she re-

1. This local rule provides that an order granting a motion for stay relief in a chapter 7 case may be entered without a hearing if no objec-

tion is filed within eleven days after the filing of the motion.

ceived a telephone call from a gentleman who identified himself as an employee of City Finance. He advised her that he had been notified that she had filed bankruptcy and that she needed to make payment arrangements or City Finance was coming that day to pick up its collateral. When Mrs. Skeen gave the employee the name of her attorney and suggested that he call him, the employee informed her that this was not his place. Mrs. Skeen testified that the employee was rude and that she hung up on him.

Mrs. Skeen further testified that ten to fifteen minutes after her conversation with the male employee of City Finance ended, she received another telephone call, this time from a female employee of City Finance, but not the "Melissa" or "Michelle" with whom she had first spoken. This female caller basically stated the same things as the male representative, that payment arrangements needed to be made or the china hutch would be repossessed that day, and that it was not her place to contact the debtors' attorney. Again, Mrs. Skeen ended this conversation by hanging up.

Mrs. Skeen testified that each conversation lasted five minutes or maybe a little longer. She stated that soon after the telephone calls, she called her attorney and that someone in his office assured her that the automatic stay would prevent any repossession. Mrs. Skeen testified that as a result of the telephone calls, she was nervous, shaken, crying, and "torn-up" the rest of the day.

The first witness for City Finance was its Kingsport office manager, Diane Tipton. Ms. Tipton introduced a computer copy of the ledger card regarding Mrs. Skeen's account with City Finance. Ms. Tipton testified that this ledger card contained nearly all of the information on the account including all contacts with the customer. The ledger card indicated that Mrs. Skeen had borrowed $1,544.50 from City Finance, which was to be repaid in twelve monthly payments of $175.68 each

with the first payment due August 19, 1999. The ledger card also revealed that only one payment had been made on the account, on September 14, 1999.

Ms. Tipton testified that according to the data contained in the ledger sheet, Mrs. Skeen's account became delinquent on August 23, 1999, when Mrs. Skeen failed to make her first payment. On August 24, a delinquency notice was mailed to Mrs. Skeen by the home office and on August 31 a notice was sent by the Kingsport office. When the September payment was missed, a delinquency notice was again mailed to Mrs. Skeen by the home office on September 24 and followed by a notice from the Kingsport office on September 27. The ledger sheet further indicated that on October 7, 11, 18, 20, 21, 26, 27, and 29, telephone calls were placed to the residence of Mrs. Skeen by an employee of City Finance, Melissa Ross, that no one answered the calls, and that Ms. Ross left a message each time. On October 29, Ms. Ross also telephoned Mrs. Skeen's mother and left a message at this residence for Mrs. Skeen.

Ms. Tipton testified that at the end of October, Ms. Ross turned Mrs. Skeen's account over to her for collection since it was their office practice for accounts more than thirty days delinquent to be handled by the office manager. Ms. Tipton testified that she telephoned Mrs. Skeen on October 30 and was informed by her that she had been laid off from her job at J.P. Stevens and that she would make a payment on November 5. Ms. Tipton thereafter unsuccessfully attempted to reach Mrs. Skeen by telephone on November 5, 10, 15, and 17, leaving a message each time. On November 18, another City Finance employee, Michael Belcher, made a field call to the debtors' residence and left a message on the door asking that City Finance be contacted. Mr. Belcher also telephoned Mrs. Skeen later that day and received a busy signal.

Ms. Tipton testified that on November 19, Mr. Belcher telephoned Mrs. Skeen. After Mr. Belcher talked briefly with Mrs. Skeen, he gave the call to Ms. Tipton. Ms. Tipton testified that in this telephone conversation, Mrs. Skeen told her that she was filing bankruptcy. In response, Ms. Tipton asked Mrs. Skeen what she planned to do about the china hutch. According to Ms. Tipton's testimony, Mrs. Skeen stated that she did not know, and Ms. Tipton told her that she needed to get in touch with her attorney and decide, because she was either going to have to pay for the hutch or it would be repossessed. When Mrs. Skeen suggested that Ms. Tipton contact Mrs. Skeen's attorney, and gave her his name and telephone number, Ms. Tipton responded that it was not her place to contact the attorney and that she would not do so.

Ms. Tipton testified that during this telephone conversation it was her belief that Mrs. Skeen had not actually filed bankruptcy but was only in the process of doing do because she had not known what she planned to do with the china hutch. Nonetheless, after the telephone call she flagged the account so that no other contacts would be made with Mrs. Skeen. Ms. Tipton testified that this was her practice regardless of whether she is told someone has actually filed or is going to file bankruptcy. She testified that in this case, in accordance with her usual practice, she awaited receipt of the official notice from the court after flagging the account, and upon receiving the notice, contacted the debtors' attorney to inquire as to the debtors' intention regarding the collateral. Ms. Tipton testified that she received the notice in the present case "right before" November 29. On that day, she telephoned Dean Greer, the debtors' attorney, and was advised that the debtors intended to reaffirm the obligation to City Finance. Ms. Tipton testified that other than the one call initiated by Michael Belcher to Mrs. Skeen on November 19, no other telephone calls or contacts were made with

the debtors after they filed for bankruptcy relief.

Also testifying on behalf of City Finance was Melissa Ross, a customer service representative with City Finance. Ms. Ross stated that she had never talked on the telephone with Mrs. Skeen, although she had telephoned her home several times and left messages. Ms. Ross stated that she did not recall talking with Mrs. Skeen as Mrs. Skeen testified and believed that the conversation did not occur since she would have recorded it on the ledger sheet or turned it over to Ms. Tipton because Ms. Tipton was handling the account at that point. Ms. Ross admitted that a telephone call into the office as Mrs. Skeen described could have come to her initially if office calls had been routed to her due to another employee's absence.

## II.

 Section 362(a)(6) of the Bankruptcy Code operates to stay "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." Similarly, subsection (a)(3) stays "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Section 362(h) of the Code provides that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." By the terms of this statute, three elements must be established before damages will be awarded for violation of the automatic stay: (1) the violation must have occurred; (2) the violation must have been committed willfully; and (3) the violation must have injured the individual seeking damages. *Adams v. Hartconn Associates, Inc. (In re Adams)*, 212 B.R. 703, 708 (Bankr.D.Mass.1997). As the individuals seeking recovery, the debtors have the burden of proof. *TranSouth Fin. Corp. v.*

*Sharon (In re Sharon)*, 234 B.R. 676, 687 (6th Cir. BAP 1999).

■ The first element which must be established is whether a violation of the stay has occurred. The parties disagree as to when the telephone call(s) in question took place. City Finance contends the date was November 19, 1999, while the debtor asserts two or three weeks later. Regardless of the exact date, because it is undisputed that the contact between the parties took place after the debtors commenced their bankruptcy on November 18, City Finance violated the automatic stay by telephoning Mrs. Skeen and requesting payment. *See Clayton v. King (In re Clayton)*, 235 B.R. 801, 807 (Bankr. M.D.N.C.1998) ("[A] technical violation occurs when a creditor violates the provisions of § 362(a) without knowledge that an active bankruptcy case is pending."); *Tipton v. Adkins (In re Tipton)*, No. 99–2043, slip op. at 18 (Bankr.E.D.Tenn. Feb. 7, 2000) ("If a creditor postpetition seeks to collect a prepetition debt, a violation of the stay has occurred, even if the creditor did not have notice of the bankruptcy at the time of the prohibited act.").

■ However, "[a] violation of the automatic stay by itself does not automatically warrant an award of monetary damages or the imposition of sanctions." *In re Lile*, 103 B.R. 830, 836 (Bankr.S.D.Tex.1989). As stated previously, the violation must have been willful and injury must have been sustained as a result of the willful violation. "The willfulness requirement refers to the deliberateness of the conduct and the knowledge of the bankruptcy filing, not to a specific intent to violate a court order." *In re Timbs*, 178 B.R. 989, 997 (Bankr.E.D.Tenn.1994) (citing *Temlock v. Falls Bldg., Ltd. (In re Falls Bldg., Ltd.)*, 94 B.R. 471, 481–82 (Bankr. E.D.Tenn.1988)). Thus, City Finance's telephone call to Mrs. Skeen was willful if it was made with notice of the debtors' bankruptcy case.

■ City Finance asserts that the telephone conversation in question took place prior to receipt of the bankruptcy notice. This assertion was supported by the testimony of Ms. Tipton and the ledger card which indicated that a conversation between Ms. Tipton and Mrs. Skeen regarding bankruptcy occurred on November 19, 1999. On the other hand, Mrs. Skeen testified that the postpetition calls took place on "the first of December", "after Thanksgiving" and "one to two to three weeks" after she received her notice of the bankruptcy filing.

The court file indicates that after the bankruptcy case was filed on Thursday, November 18, 1999, notice was mailed by the Bankruptcy Noticing Center in Reston, Virginia on Sunday, November 21, and notice was received by the bankruptcy clerk's office in Greeneville, Tennessee on Tuesday, November 23. Thanksgiving was on Thursday, November 25. The first day of December was Wednesday of the following week. In all likelihood, the earliest Mrs. Skeen would have received her notice would have been the same day that it was received by the clerk's office, Tuesday, November 23. The first of December, which began eight days later, would fall within the "one to two to three weeks" time frame.

After consideration of all the evidence, the court finds the November 19 date to be the most credible. If Mrs. Skeen's testimony regarding the day the conversations took place is to be believed, that is, on a date two or three weeks after she received her bankruptcy notice, it would mean that City Finance did not contact the debtors for a period of two, three, or even four weeks after the bankruptcy filing. Yet the evidence was undisputed that prior to the bankruptcy filing, City Finance had attempted to get in touch with Mrs. Skeen and had left messages for her on an almost daily basis. In light of the frequency and persistency of these contacts, the court finds it difficult to believe that City Finance would leave a telephone message for

Mrs. Skeen to call on November 17, attempt to visit her at home on November 18, follow up with an attempted telephone call on the evening of November 18, and then not attempt to contact her at all for two or three weeks until sometime in December. The more likely scenario is that City Finance followed up the November 18 attempted contacts with a telephone call on November 19 as it asserts. Furthermore, no evidence contradicted Ms. Tipton's statement that she telephoned Mr. Greer on November 29 after she received official notice of the bankruptcy in order to determine whether the debtors desired to surrender the collateral or reaffirm the debt to City Finance. It is unlikely that she would have then called Mrs. Skeen later with the same inquiry.

Because the debtors' bankruptcy case was filed on November 18, and notice was not mailed until November 21, City Finance did not have prior notice of the debtors' bankruptcy at the time the telephone conversation or conversations took place between the parties on November 19. Thus, the only notice that City Finance might have had of the bankruptcy filing would be the statements of Mrs. Skeen on the telephone. Due to the time proximity of the telephone calls and the bankruptcy filing and the lack of evidence that Mrs. Skeen knew on November 19 that her case had been filed the previous day (the debtors signed the petition on November 14), it would be more likely that Mrs. Skeen told City Finance "I'm filing bankruptcy" rather than "I have filed bankruptcy." This statement along with Mrs. Skeen's inability to advise Ms. Tipton as to her intentions with respect to the china hutch would reasonably have led City Finance to conclude that Mrs. Skeen had not actually filed

bankruptcy but was only in the process of doing so. Thus, whether City Finance made one or two telephone calls to Mrs. Skeen on November 19, the court finds that at the time of the telephone calls City Finance did not know that the debtors had actually filed for bankruptcy relief. As such, while the telephone calls were in violation of the stay, the calls were not willful and therefore not actionable.[2] *Mitchell Constr. Co. v. Smith (In re Smith)*, 180 B.R. 311, 319 (Bankr.N.D.Ga. 1995) ("A violation of the automatic stay which occurs without knowledge of a pending bankruptcy case does not constitute a willful violation which will subject a creditor to sanctions under § 363(h).").

Having reached this conclusion, it is clear that the debtors' motion must be denied. Thus, it is unnecessary for the purposes of this case for the court to address whether the debtors were injured by City Finance's stay violation. Even so, the court believes that it will be helpful to future litigants in stay violation matters if the court considers the merits of the debtors' injury allegations.

### III.

Section 362(h) "requires a finding of actual injury." *Archer v. Macomb County Bank*, 853 F.2d 497, 500 (6th Cir. 1988). *See also Whitt v. Philadelphia Housing Auth. (In re Whitt)*, 79 B.R. 611 (Bankr.E.D.Pa.1987) ("[N]o damages will be awarded as a result of the violation of the automatic stay if there was no evidence that the debtor suffered any harm."). "A damage award must not be based on 'mere speculation, guess, or conjecture.'" *Id.* at 499. Although Mrs. Skeen testified that she was "torn-up," shaken, and nervous

---

**2.** The court realizes that there are often disagreements between a creditor and a debtor as to what was said in a telephone conversation regarding bankruptcy, especially when the creditor is facing possible damages for violating the stay. In order to reduce the possibility of stay violation accusations, a creditor advised that a bankruptcy has been filed or is being filed should continue the conversation only long enough to obtain information to verify the bankruptcy, i.e., the creditor should ask for the case number and the district and division in which the case is pending. If this information is unavailable, the creditor should ask for the name of the debtor's attorney and then promptly hang up. Questions regarding the debtor's intentions with respect to collateral are inappropriate.

the rest of the day as a result of the telephone calls, there was no evidence that she sought medical relief or that the anxiety caused by City Finance's collection efforts rendered her incapable of going about her daily routine. Mrs. Skeen further testified that soon after receiving these calls, she contacted her attorney's office and received assurances that repossession was not possible. As succinctly stated by one bankruptcy court, "[b]ecause the emotional distress suffered ... was fleeting, inconsequential, and medically insignificant, ... it is not compensable." *Crispell v. Landmark Bank (In re Crispell)*, 73 B.R. 375, 380 (Bankr.E.D.Mo. 1987).

Mrs. Skeen does seek reimbursement for the wages which she lost by her attendance at the evidentiary hearing in prosecution of the debtors' motion. She testified that by attending the hearing she lost four hours of work at an hourly wage of $7.10. The debtors' attorney also seeks compensation for the time which he has spent pursuing the motion. Mr. Greer stated that prior to the hearing, he had spent 3.7 hours of time, and the hearing itself, along with the time counsel spent waiting between dockets was three hours. Mrs. Skeen testified the Mr. Greer agreed to prosecute this motion on the debtors' behalf at an hourly rate of $125.00.

However, all of these damages were incurred due to the filing and prosecution of the debtors' motion against City Finance. They did not necessarily flow from City Finance's stay violation. As stated above, the debtors in this case suffered no immediate damage or injury as a result of, at most, two telephone calls within fifteen minutes of each other from City Finance to Mrs. Skeen. There was no evidence that the debtors feared that these calls would continue, that the china hutch would be repossessed, or that further stay viola-

tions would occur unless the debtors obtained relief from the court. In fact, there was no evidence that the telephone calls were sufficiently worrisome that debtors' counsel contacted City Finance by telephone or letter to demand that the contacts be discontinued. To the contrary, after the November 19 calls, no further action was taken with respect to the stay violations until almost two months later when the debtors filed the motion requesting damages on January 18 of this year.[3]

Under similar facts, other courts have been reluctant to award fees and expenses for costs incurred solely in connection with prosecution of the motion itself. For example, in *Newell* a debtor's attorney pursued a motion for sanctions against a creditor after it mailed the debtor two computer-generated invoices requesting payment. *In re Newell*, 117 B.R. 323 (Bankr.S.D.Ohio 1990). Upon reviewing the evidence and considering the statements of counsel, the court held that the creditor's actions were inadvertent and "would have ceased after the first violation had it received a communication from the debtor or his counsel bringing the computer-generated billing to someone's attention." *Id.* at 325. The court noted that if such action had been taken, the only damages would have been minimal expenses. "Instead, the debtor [was] forced to travel from his work in Tennessee, lose a day's work and incur attorney fees for the preparation of the motion, the hearing presentation and the rather extensive pre-trial brief filed by his attorney." *Id.* The court cautioned:

> [T]he Court's time and parties' monies should be spent on matters which are of serious consequence to the parties involved. As it relates to stay violations, such seriousness is not necessarily equated to the size of the economic impact of a matter, but may well include emo-

---

**3.** The court further notes that the debtors' motion was not filed until after City Finance moved on December 27, 1999, for relief from the automatic stay in order to repossess the china hutch and after passage of the eleven-day period in which to object to that motion pursuant to E.D.Tenn. LBR 4001–1(b).

tional trauma visited upon debtors by creditors who refuse to honor either the automatic stay or the discharge injunction, who harass debtors in other inappropriate ways or who demonstrate repetitive noncompliance. This Court will always hear and give serious attention to such allegations. But the unnecessary escalation of a matter of somewhat limited consequence which could have been resolved by much less lawyering does not make economic or emotional sense. Such escalation creates damages, magnifies costs, and burdens the system. More significantly, such efforts reveal a lack of perspective.

*Id.* at 326. As a result, the court only awarded fees "for the reasonable value of legal services which should have been sufficient to resolve [the] matter in an expeditious manner." *Id.*[4]

In *Price,* the bankruptcy court awarded the debtor $13 in actual damages caused by a creditor sending a collection letter for a $62 medical bill, but denied attorney's fees of $572.50 on the ground that the debtor should have contacted the creditor to resolve the violation in a nonlitigious manner before bringing the contempt motion. *In re Price,* 179 B.R. 70, 71 (Bankr. S.D.Ohio 1995). The district court reversed, finding that it was improper to impose a blanket pre-notification rule. However, the district court did direct that in awarding fees, the bankruptcy court should consider whether the injury caused and damages incurred, other than attorney's fees, only amount to the cost of

appearing in court to litigate the contempt motion; whether the burden of requiring debtor's attorney to notify the creditor of the violations is insignificant; and whether the offending creditor acted in bad faith. *Id.* The district court then advised that if findings on these factors are made in favor of the creditor, "fees should be awarded in an amount that would have been incurred if the matter had been resolved in a nonlitigious manner." *Id.* Upon remand after consideration of the factors noted by the district court, the bankruptcy court concluded that the dispute could have been resolved by a one-half hour telephone call, letter, or brief in-person discussion and awarded fees of only $75 based on the attorney's hourly rate of $150. *Id.* at 73.

The criteria for awarding fees mandated by the district court in *Price* has also been followed by another bankruptcy court. *See In re Robinson,* 228 B.R. 75, 86 (Bankr.E.D.N.Y.1998). The *Robinson* court observed that any award of fees pursuant to § 362(h) must be reasonable and necessary, which does not include unnecessary litigation costs. *Id.* at 85 ("The policy of section 362(h), to discourage willful violations of the automatic stay, is tempered by a reasonableness standard born of courts' reluctance to foster a 'cottage industry' built around satellite fee litigation.").

In *Brock Utilities,* after the IRS mailed the chapter 11 debtor a computer-generated notice of intention to levy, the debtor moved for damages for violation of the

---

**4.** Prior to *Newell* decision, the bankruptcy judge who authored that opinion issued the *Roush* decision wherein she set forth certain settlement procedures which must be followed prior to the court setting a hearing on a contempt motion related to alleged violations of the discharge injunction. *In re Roush,* 88 B.R. 163 (Bankr.S.D.Ohio 1988). These procedures required that a debtor's attorney communicate directly with the creditor prior to filing a contempt motion for violation of the discharge injunction and that if the communication succeeds and the contemptuous behavior ceases, the debtor's attorney may request fees sufficient to compensate for the

time required for the communication and for preparation of the application and order allowing the fee award. *Id.* at 165. The court anticipated that such efforts should require no more than one to one and one-half hours of the attorney's time. *Id.* With respect to unsuccessful communications, the debtor's attorney must document the efforts in an affidavit filed with the court at the time the motion for contempt is filed. If the contempt motion is sustained, the debtor will be awarded attorney's fees and any actual damages caused by the creditor's action or the need to appear in court. *Id.*

stay. *In re Brock Utilities & Grading, Inc.*, 185 B.R. 719 (Bankr.E.D.N.C.1995). The court concluded that it need not decide whether the IRS's violation of the stay was "willful" because there was no evidence that the debtor had suffered any injury. The court noted that a simple telephone call by debtor's counsel to the IRS "would have allayed any fears that the debtor might have had, and the motion for sanctions would not have been required [and, therefore,] [a]ny costs involved in bringing this motion were unnecessarily incurred and should not be reimbursed by the IRS." *Id.* at 720–21.

The facts in the case of *McHenry* are also enlightening. The creditor, after misplacing its notice of the debtors' bankruptcy filing, telephoned the debtors to discuss their delinquent automobile payments. The debtors advised the creditor of the bankruptcy filing, stated that they probably would not reaffirm the debt, and gave the caller the name and telephone number of their attorney. Two days later, the creditor telephoned the debtors' attorney, who advised that the debtors would not be reaffirming the debt and would return the automobile to the creditor. Without moving for relief from the stay, the creditor telephoned the debtors to make arrangements to pick up the automobile and thereafter repossessed the vehicle in accordance with these arrangements. *McHenry v. Key Bank (In re McHenry)*, 179 B.R. 165, 166 (9th Cir. BAP 1995).

The debtors then moved for sanctions for violation of the stay by the creditor. The bankruptcy court denied the motion, finding a willful stay violation but no damages because the only injury was the attorney's fees incurred in bringing the motion. Upon appeal, the debtors argued that they were entitled to "actual 'noneconomic' damages for violation of their 'fundamental bankruptcy right to be left

alone.'" *Id.* at 168. The bankruptcy appellate panel disagreed, and distinguished the cases cited by the debtors, noting that in those cases, the violator had engaged in egregious misconduct or the motion for sanctions was necessary to stop a continuing course of conduct. In closing, the panel observed:

> [N]ot every violation of the section 362 automatic stay should result in punishment to the offender. As here, certain section 362 stay violations are technical in nature and need no punishment to deter further violations. Instances involving no actual damages to the entity offended by a violation, are, and will be, rare, and it is not likely creditors will intentionally run the risk of such liability. The automatic stay afforded by section 362 is intended to be a shield protecting debtors and their estates, and should not be used as a sword for their enrichment.

*Id.* at 168–69. *See also In re Hill*, 222 B.R. 119, 124 (Bankr.N.D.Ohio 1998) (Where the stay violation is relatively minor, two collection letters, and the debtor's sole damages are attorney's fees, the court "should review those fees carefully to avoid the reality or appearance that the Court is rewarding an excessively litigious approach to such violations."); *In re Haan*, 93 B.R. 439 (Bankr.W.D.N.C.1988) (Lack of injury, other than attorney's fees for bringing motion, resulting from non-willful stay violation "should operate . . . to discourage filing of the sanctions motion in the first place—and require its denial if filed."); *In re Whitt*, 79 B.R. at 613 (the possibly innocent and mild violations of the automatic stay, coupled with the tenant's failure to produce any evidence of actual damages, precluded any award of monetary damages or attorney's fees to the debtor, and confined her to declaratory relief).[5] *Compare Maritime Asbestosis*

---

5. The *Whitt* decision along with a few others hold that attorney's fees may not be awarded absent separate injury to the complainant. *See, e.g., In re Whitt,* 79 B.R. at 616 (costs and

attorney fees are allowable only to embellish actual damages); *Lovett v. Honeywell,* 930 F.2d 625, 629 (8th Cir.1991) (same, citing *Whitt*); *Loethen Oil Co. v. Hen House Inter-*

*Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 112 B.R. 526, 533 (S.D.N.Y.1990) (no duty to mitigate attorney's fees where there are repeated violations of the automatic stay and such violations would be certain to recur without court intervention); *Sizemore v. Dayton Emergency Specialists (In re Sizemore)*, 138 B.R. 540 (Bankr.S.D.Ohio 1992) (for stay violations resulting from two calls and dunning notices, debtor awarded $50.00 in compensatory damages for migraine headaches which required medical treatment; debtor also awarded only $50.00 in attorney's fees rather than $875.00 requested by attorney in connection with bringing of motion since no evidence that attorney contacted creditor to request cessation of collection attempts, but filing of motion did cause collection efforts to stop); *McLaughlin v. Fireman's Trust Mortgage Corp. (In re McLaughlin)*, 96 B.R. 554, 561 (Bankr.E.D.Pa.1989) (counsel for a debtor who is jeopardized in any significant manner by stay violation and reasonably resorts to court to remedy the violation should recover at least some measure of damages); *In re Davis*, 74 B.R. 406, 411 (Bankr.N.D.Ohio 1987) ("An award of attorney's fees is appropriate where an initial violation of the stay is followed by Debtor's [sic] having to resort to the courts to enforce his rights.").

### IV.

The foregoing constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052. An order will be entered in accordance with the memorandum opinion denying the debtors' motion.

---

*state, Inc. (In re Hen House Interstate, Inc.)*, 136 B.R. 220, 223 (Bankr.E.D.Mo.1992) (court denied attorney's fees incurred in bringing motion for sanctions because there were no actual damages proven to which the attorney's fees could attach); *In re Haan*, 93 B.R. at 441 ("Here there is 'no harm—no foul' and no injury—no attorney's fees."). However, other courts have recognized that attorney's fees may be recoverable as damages under section 362(h) for a willful violation of the automatic stay even if the debtor has suffered no other compensable harm. *See, e.g., Singley v. American Gen. Finance (In re Singley)*, 233 B.R. 170, 174 (Bankr.S.D.Ga. 1999); *In re Robinson*, 228 B.R. at 85. Recognizing that a response by the debtor's attorney may be appropriate even if the stay violation has not otherwise injured the debtor, this court believes the latter view to be the better reasoned one.