In re Marvin Ray CARRIGAN, S.S. # 238–78–7609, Debtor.

Bankruptcy No. C–B–89–30038.

United States Bankruptcy Court, W.D. North Carolina.

April 27, 1989.

P. Wayne Sigmon, Gastonia, N.C., for debtor.

David W. Smith, III, Gastonia, N.C., for creditor, Cleo Screws.

## ORDER GRANTING SANCTIONS AGAINST CLEO SCREWS

GEORGE R. HODGES, Bankruptcy Judge.

This matter is before the court on the debtor's Motion for Sanctions against a creditor of the debtor, Cleo Screws (hereinafter "Screws"). From the testimony presented and the record, the court finds and concludes that Screws willfully violated the automatic stay of 11 U.S.C. § 362(a) and that his conduct merits sanctions pursuant to 11 U.S.C. § 362(h).

### FINDINGS OF FACT

1. The debtor filed a petition pursuant to Chapter 13 of the Bankruptcy Code on January 10, 1989. The debtor's schedules listed a debt in favor of Screws. Screws received written notice of this bankruptcy case, he attended the debtor's Section 341 meeting of creditors on February 15, 1989, (represented by counsel), and his attorney examined the debtor at that time. Screws acknowledged that he had both knowledge and notice of the bankruptcy case prior to March 12, 1989, the date of the incident which gives rise to this sanctions motion.

2. Screws has filed a Proof of Claim in this case. He has a claim secured by a second lien on the debtor's five acre mobile home park. In the debtor's confirmed Chapter 13 plan, Screws' pre-petition arrearage claim in the sum of $4,239.35 is being paid through the plan while his contractual post-petition monthly payments of approximately $330.00 each are being paid by the debtor directly to Screws.

3. The debtor and his wife, Mrs. Linda Carrigan (hereinafter "Mrs. Carrigan"), both testified about the events that occurred on Sunday evening, March 12, 1989. Their testimony was consistent and credible. It is summarized as follows:

(a) Sometime after after 9:00 p.m. on that Sunday night, March 12, 1989, Screws knocked on the debtor's door. The debtor and Mrs. Carrigan had already gone to bed and their lights were off.

(b) When the debtor went to the door he was surprised to see Screws. The debtor said "What can I do for you?" Screws replied "I want my damned money." The debtor replied, "You need to contact my lawyer." Screws replied (loudly), "I want my money right now, I want two times $330 right now, or you're going to regret it." The debtor replied, "You need to contact my lawyer."

(c) By this time Mrs. Carrigan had been aroused by Screws' voice and had joined the conversation. Mrs. Carrigan told Screws "Cleo, you have no right to be here. Would you please leave?" Screws replied "Hell yes I do too. I want my money."

(d) Again, the debtor replied "Contact my lawyer." To that Screws replied, "Who, that s—thead, Wayne Sigmon; I don't want to talk to that son of a bitch; I want my money."

(e) At that point the debtor said "Cleo, I am asking you to get off my property now." Screws replied, "I'm not going anywhere without my money." Mrs. Carrigan said "If you don't leave right now, ... we'll file a lawsuit against you for harassment." Screws replied, "You just go right ahead and you'll get more than you bargained for." Screws then said "You should have gave (sic) me this property to start with instead of making us go through all this s—t." After more of the same talk, the debtor then said "Cleo, if you don't leave, or I'm going to call the police." Screws said, "I'll leave, but this is not the last you'll hear about it from me."

(f) As Screws walked away from the debtor's door, he made an obscene gesture to the debtor and his wife using his middle finger.*

(g) During the whole confrontation Screws was loud and abusive.

4. The debtor further testified that Screws was driving a white Chevrolet S–10 pickup truck which Screws parked in the debtor's driveway at a distance of approximately twenty-five feet from the debtor's door. The debtor testified that Screws was alone and that no one was sitting in his truck while he was at the debtor's door. The debtor testified that Screws' vehicle was parked right behind his in the driveway.

5. Screws answered the debtor's motion and appeared and defended his actions. He admitted going to the debtor's residence at about 9:00 p.m. on Sunday, March 12, 1989. But, from that point his account of the events differs substantially from the debtor's account. Screws testified that when the debtor came to the door, he said "We're not getting paid outside of the court system ... You were to pay us directly like you have been in the past and you haven't been doing it ... Are you paying the money into the trustee, or did you take it by Wayne Sigmon's office ... uh, what's happening?" He admitted saying that "two months times $33.25 (sic) equals $633.50," but he denied using profanity or otherwise being abusive. He admitted that the debtor told him to talk his attorney. Screws testified that when the debtor's wife came to the door, she began shouting in a loud and abusive tone, "What are you doing here—you have no ... right to be here—get the ... off my property." He stated that Mrs. Carrigan used several obscene words toward him. Screws testified that he was at all times a perfect gentleman. He further testified that there were at least five hundred people who could support that fact. Screws also denied using any obscene gesture, but explained that, as

he left the debtor's home, he threw his arms up in frustration.

6. Screws also disputed the location of his truck and the attendance of witnesses on the night of March 12. Screws testified that he was with his wife and brother-in-law at the time; that he had been driving his brother-in-law around Gaston and Mecklenburg Counties since 4:00 p.m. that afternoon to show him the sights (since he had recently relocated to this area); and that they had a change of clothes hanging in the back of the truck because they could never be sure at what type of "function" they might be called upon to appear. Significantly, though, Screws testified that his brother-in-law had driven the truck up to the debtor's residence (and, thus, had an unimpaired view of the events at the debtor's front door). Screws' explanation for the change in drivers—from him to his brother-in-law—was that they had previously stopped at Wendy's for a sandwich and he had drunk a "big tea." Having thus placed a corroborating witness in a place with a view, Screws attempted to improve the view (and the hearing of the witness) by testifying that the driver's window was down because his brother-in-law smoked cigarettes.

7. Frank Brayton testified that he is Screws' brother-in-law, that he resides with the Screws and that he is employed by Screws. He testified that he was sitting in the pickup truck while Screws went to the debtor's door. He testified that Screws did not become loud and abusive and did not use an obscene gesture. Under cross examination, Brayton testified that Screws' truck was the only vehicle in the debtor's driveway on the night in question.

8. Screws also testified that his wife, Fran Screws, remained in the rear seat of his pickup truck while he went to the debtor's door.

9. Fran Screws testified that she was with Screws on the night of March 12 and that she remained in his pickup truck while he went to the debtor's door. She testified

* This is the same gesture used by Nelson Rockefeller in dealing with hecklers during his presidential nomination campaign, by Roger Maris in dealing with opposing fans, and by a captured crewman of the U.S.S. Pueblo in a North Korean propaganda photo.

that though she could not hear the contents of Screws' conversation with the debtor and Mrs. Carrigan, that Screws did not become loud and abusive. She testified that Screws did not use an obscene gesture, but rather threw his hands in the air as he was leaving the debtor's door.

10. This case presents a classic swearing match. Either Screws and the Carrigans attended separate incidents the night of March 12, or someone is not telling the truth. Everyone here was an interested party by involvement or, at least, by marriage or employment. The court has assessed the testimony based upon the demeanor of the witnesses, the content of their testimony and upon its own experience with the way people normally act. Based on that, the court finds the debtor's and his wife's testimony to be credible and rejects the respondent's testimony for several reasons: The debtor appeared to be a mild mannered, peaceful type person who would not have incited a confrontation or contributed to one. His testimony about what he said on the night of March 12 is largely uncontradicted by Screws. His testimony of what was said by all parties that night was not seriously rebutted on any account. The debtor's wife's testimony was consistent with the debtor's account. The court believes the debtor's (and his wife's) account of Screws' conduct and statements on the night of this incident. Moreover, Screws' testimony was too well tailored, contrived and just not believable: First, no "gentleman" raps on someone's door at that time of a Sunday night for the purpose of having a "gentlemanly" conversation about a debt as Screws contended he did. Second, there may be five hundred people in Gaston County who would testify that Screws is a "gentleman," but his conduct that Sunday night certainly did not measure up to that standard. Third, the court is unable to believe the testimony that Screws relinquished control of the truck to his brother-in-law because he had consumed a "big tea." Finally, Screws' explanation of his actions appeared contrived and inherently unbelievable. Based on these reasons and its own observation of Screws on the witness stand, the court

finds Screws' explanation incredible. Likewise, the court rejects the corroborating testimony of Brayton and Fran Screws on account of their interest, bias and unconvincing demeanor.

11. Screws complained that the debtor's wife used abusive language toward him. While she appeared capable of that, no finding is necessary on that point since, given Screws' conduct, Mrs. Carrigan's alleged abuse would have been justified by the circumstances.

12. Screws committed a knowing, willful and bodaciously flagrant violation of the § 362 stay—one which amounted to a breach of the peace and, but for the debtor's calm demeanor, could have precipitated violence. The debtor has testified that Screws' visit to his home has caused him great fear, stress, and anxiety in addition to the humiliation suffered on the night of March 12. Although not scientifically calculable, that damage should be compensable.

13. Screws' actions were personal, flagrant, profane, played out on the debtor's doorstep at night on the Sabbath, and wholly without excuse. Such conduct is egregious and far beyond the bounds of what should be tolerated by a civilized society. Consequently, Screws should be subject to punitive damages.

14. The court finds that the debtor has suffered $1,000.00 actual damages and is entitled to an additional $5,000.00 punitive damages as a result of Screws' actions on March 12, 1989. In addition, the court has determined that Screws' prepetition claim of $4,239.35 should be stricken. Finally, the debtor's attorney should be awarded his reasonable attorney's fees in connection with this proceeding.

## DISCUSSION AND CONCLUSIONS OF LAW

15. 11 U.S.C. § 362 provides generally for the automatic stay of any and all proceedings against a debtor once a bankruptcy has been filed. Its importance is echoed in the legislative history of § 362 which provides in part that:

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. *It stops all collection efforts, all harassment,* and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy. (Emphasis added and citation omitted).

Quoted in *Budget Service Co. v. Better Homes of Virginia,* 804 F.2d 289, 292 (4th Cir.1986). Screws' action of visiting the debtor's home and requesting payment with actual knowledge of the bankruptcy case is a willful violation of the automatic stay.

16. Screws argued that his actions are protected by this court's Local Rule 30. This argument presupposes that the court believes Screws' version of the events of March 12, 1989, which it does not. The court does not believe Screws' assertion that he was merely inquiring about payments, and therefore, specifically rejects that position. Nonetheless, Local Rule 30 is no defense here. It provides in pertinent part:

### SECURED CREDITOR CONTACT WITH CHAPTER 13 DEBTOR

In Chapter 13 cases, affected secured creditors may....

2. Contact the debtor to inquire about postpetition payments to be made outside the Plan directly to the creditor and on such payments the creditor may issue post-petition delinquency notices....

17. Even if the court believed Screws' version of the events in question, Local Rule 30 would not validate his admitted action of going to the debtor's residence at about 9:00 p.m. on a Sunday night to collect a payment—or even to discuss the status of the account. No reasonable person could read Local Rule 30 to permit creditors to attempt to collect debts at the debtor's home at 9:00 p.m. on a Sunday night. Implied in Local Rule 30 is the requirement that the contacts that are authorized be

*reasonable* contacts. Even under Screws' scenario, his contact with the debtor was not reasonable or permitted by Local Rule 30.

18. Pursuant to § 1306(a)(2), property of the estate in a Chapter 13 case includes "earnings from services performed by the debtor after the commencement of the case ..." Accordingly, Screws' March 12, 1989, attempt to obtain payments from the debtor is an "act to obtain possession of property of the estate" and thus a violation of § 362(a)(3) as well as of other provisions of § 362(a). This court concludes as a matter of law that Screws has willfully violated § 362 and is subject to sanctions pursuant to § 362(h).

19. Section 362(h) provides for the consequences of a willful violation of the stay as follows:

Any individual injured by any willful violation of a stay provided by this Section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

Section 362(h) applies only to a "willful" violation of § 362. "Willful" means intentional or deliberate conduct. *See, In re Tel–A–Communications Consultants, Inc.,* 50 B.R. 250, 254 (Bkr.D.Conn.1985), cited with approval in *Budget Service Co. v. Better Homes of Virginia, Inc.,* 804 F.2d at 292. A willful violation occurs when a creditor with notice of the bankruptcy case nevertheless performs one of the acts prohibited by § 362(a). Screws committed a willful violation of the § 362(a) stay for which the debtor is entitled to relief as provided in § 362(h).

20. Once a willful violation of a stay has been found, § 362(h) requires that actual damages, including costs and attorneys' fees, "shall" be recovered. The debtor's actual injury here is somewhat imprecise, but it is real—and, it is certainly the result of the actions of Screws. Assessing the value of this type of injury is not susceptible to a formula or precise measurement. However, the outrageous nature of Screws' actions is sufficiently

strong to produce the anxiety expressed by the debtor. The court finds, in all of these circumstances, that the debtor was actually damaged in the amount of $1,000.00. Furthermore, the debtor is entitled to an award of attorneys' fees and costs. The court will assess appropriate attorneys' fees and costs upon application by the debtor's counsel along with appropriate supporting documentation.

21. Pursuant to § 362(h), an award of punitive damages is within the court's discretion. Generally, punitive damages will be awarded where a willful violation of the stay occurs by way of egregious or vindictive conduct. *See, In re Midkiff,* 85 B.R. 467 (Bankr.S.D.Ohio 1988). Screws' conduct certainly was egregious and vindictive. The natural consequence of Screws' conduct was to oppress, harass, and abuse the debtor. Screws' conduct was plainly despicable and merits punishment. This court finds as a fact and concludes as a matter of law that, in order to effect such punishment on Screws, the debtor should be awarded punitive damages of $5,000.00, that Screws' pre-petition arrearage claim in the sum of $4,239.35 should be discharged, and that the lien of Mr. Screws upon the debtor's real property be voided and deemed satisfied to the extent of the sum of $4,239.35.

It is therefore ORDERED that:

1. The debtor shall have and recover of Cleo Screws the sum of $1,000.00 as actual damages and the sum of $5,000.00 as punitive damages with both amounts to be paid to the debtor within thirty days of the date of entry of this Order;

2. The debtor is entitled to recover of Cleo Screws reasonable attorneys' fees and costs. Counsel for the debtor shall forthwith submit and serve upon the attorney for Screws an application for fees and costs. Counsel for Screws shall have ten days thereafter to respond to the application after which the court will assess the amount of attorneys' fees and costs due;

3. That the pre-petition claim of Screws in the sum of $4,239.35 discharged and stricken from the debtor's Chapter 13 plan; and

4. That the lien of Screws upon the debtor's real property is deemed null and void to the extent of the sum of $4,239.35.