**In re George E. DAWSON, Barbara Dawson, Debtors.**

**George E. Dawson and Barbara Dawson, Plaintiffs,**

**v.**

**Washington Mutual Bank, etc., Defendant.**

**Bankruptcy No. 98–45213 TG.**

**Adversary No. 98–4796 AT.**

United States Bankruptcy Court, N.D. California.

July 27, 2006.

---

Aaron Paul, Kornfield, Paul and Nyberg, Oakland, CA, for Debtors.

## MEMORANDUM OF DECISION ON DAMAGES AFTER REMAND

LESLIE TCHAIKOVSKY, Bankruptcy Judge.

In this adversary proceeding, the above-captioned debtor, Barbara Dawson ("Mrs.Dawson"), seeks a determination that Washington Mutual Bank (the "Bank") willfully violated the automatic stay in a prior chapter 7 case filed by her husband, George E. Dawson ("Mr.Dawson"), who is now deceased.[1] She seeks actual and punitive damages on his behalf based on the Bank's violation pursuant to

---

1. Mr. Dawson was alive when this proceeding was filed but died during the appellate period. After the case was remanded to this Court, Mrs. Dawson obtained a order from the Court establishing her right to assert his claim for damages as his surviving spouse.

11 U.S.C. § 362(h).[2]  The Court's findings and conclusions are set forth below.

## PROCEDURAL BACKGROUND

In its original decision, the Court found only a limited automatic stay violation and granted Mr. Dawson only a modest amount of attorneys' fees and other damages.  The Court found insufficient evidence to support a claim for emotional distress damages.  The Court's decision was appealed to the United States District Court for the Northern District of California (the "District Court") which reversed and remanded.  However, the District Court affirmed the Court's determination as to emotional distress damages.  The District Court's decision as to emotional distress damages was then appealed to the Ninth Circuit Court of Appeals (the "Ninth Circuit") which reversed and remanded on this issue, concluding the Court had applied the wrong standard in determining that Mr. Dawson had not presented sufficient evidence to entitle him to emotional distress damages.

On remand, the parties agreed on a two stage procedure, with the legal issues to be addressed first, then the factual issues.  After the first stage of briefing and argument, on February 23, 2006, the Court issued a memorandum of decision addressing the legal issues (the "Legal Issues Memo").  The parties agreed to submit the remaining factual issues to the Court on the existing evidence in the record and to submit their final argument in writing.  The Court has reviewed those submissions and the applicable law and now issues its decision on damages.

## SUMMARY OF FACTS

On or about July 8, 1987, Great Western Bank ("Great Western"), the predecessor-in-interest to the Bank, made a home mortgage loan (the "Loan") to Bill Hayes, Jr. ("Hayes").  Hayes executed a promissory note (the "Note"), evidencing his obligation to repay the Loan. He also executed a deed of trust (the "First Deed of Trust"), securing his obligation with a lien on real property located at 3490 Ridgewood Way, Richmond, California (the "Home").  The First Deed of Trust was recorded shortly thereafter.

Later in 1987, Hayes deeded the Home to the George and Barbara Dawson (the "Dawsons").  Although the Dawsons did not assume the Loan, they took occupancy of the Home and began making payments on the Loan, which the Bank accepted.  In 1989, the Dawsons executed a second deed of trust (the "Second Deed of Trust") in favor of a Mr. and Mrs. Dixon (the "Dixons") to secure an obligation of $40,000.

The Dawsons had difficulty making payments on the Loan in 1993, and the Bank began foreclosure proceedings.  To stop the foreclosure sale, the Dawsons filed a chapter 13 petition, commencing their first chapter 13 case.  The Dawsons defaulted on their post-petition payments to the Bank, and the Bank filed a motion for relief from stay.  The Bank obtained an "adequate protection" order, requiring the Dawsons to cure the defaults.  The Dawsons failed to fully cure the defaults as required, and the Bank was granted relief from the automatic stay.  However, shortly before the foreclosure sale was scheduled to take place, the Dawsons cured the remaining defaults, and the sale was canceled.

---

**2.**  The Bankruptcy Abuse and Consumer Protection Act of 2005 ("BAPCPA") modified and redesignated this provision as 11 U.S.C. § 362(k).  However, the modification is inap-

plicable to this proceeding, and the Court will continue to refer to the section as formerly designated.

Later in 1995, the Dawsons fell into default again on their payments to both the Bank and the Dixons. On October 2, 1995, the Bank recorded a new notice of default. On October 12, 1995, the Dixons conducted a foreclosure sale on the Second Deed of Trust and purchased the Home with a credit bid. On January 16, 1996, the Bank recorded a notice of sale on the First Deed of Trust, scheduling a foreclosure sale for February 8, 1996.

In the meantime, the Dawsons persuaded their relatives, the Jamesons, to acquire the Home from the Dixons. An agreement was executed whereby the Jamesons would sell the Home to the Dawsons provided the Dawsons did certain things within 30 working days (the "Jameson Agreement").[3] The Jameson Agreement was never recorded. On February 5, 1996, the Dixons recorded the trustee's deed, giving them record title to the Home (the "Dixon Trustee's Deed"). On February 6, 1996, Mr. Dawson filed a chapter 7 petition. On February 7, 1996, the Dixons executed a grant deed, transferring legal title to the Home to the Jamesons (the "Dixon Grant Deed"). The Dixon Grant Deed was recorded on February 8, 1996.

In its original decision, the Court found that the Bank had notice of Mr. Dawson's February 6, 1996 bankruptcy filing by February 14, 1996 at the latest.[4] However, no evidence was presented that the Bank had notice that Mr. Dawson still claimed an interest in the Home prior to March 1, 1996. As a result, the Bank conducted its foreclosure sale on February

8, 1996, taking title to the Home pursuant to a credit bid. The Bank recorded its trustee's deed on February 14, 1996.

On February 20, 1996, the Bank served a three day notice to quit on the Dawsons. On February 27, 1996, the Bank filed an unlawful detainer action. On March 1, 1996, the Bank was informed that the Dawsons still claimed an ownership interest in the Home. On March 14, 1996, the Bank dismissed the unlawful detainer action.[5] However, it did not rescind the foreclosure sale until August 8, 1996.

On June 2, 1998, the Dawsons filed the above-captioned chapter 13 case and commenced this adversary proceeding against the Bank, seeking damages for willful violation of the automatic stay pursuant to 11 U.S.C. § 362(h).

## DISCUSSION

### A. DECISION ON REMAND

In the Legal Issues Memo, I issued the following legal conclusions:

#### 1. Issues Raised by Death of Mr. Dawson

Two new legal issues were presented by the death of Mr. Dawson during the appellate phase of this proceeding: (1) whether emotional distress damages survive the death of the claimant and (2), if so, whether Mrs. Dawson had standing to assert them. For the reasons stated in the Legal Issues Memo, the Court concluded that a claim for emotional distress damages does survive the death of the claimant. The

---

3. The last signature was placed on the Jameson Agreement on February 6, 1996. Thirty working days later expired on March 19, 1996.

4. A s set forth in the Legal Issues Memorandum, based on the evidence presented, it appeared that the Bank actually had notice of the February 6, 1996 bankruptcy filing on February 6, 1996.

5. In my original decision, I held that service of the three day notice and the unlawful detainer action violated the automatic stay protecting the Dawsons' possessory interest in the Home.

Court concluded that Mrs. Dawson did not at that time have standing to assert that claim on Mr. Dawson's behalf, having failed to obtain an order of substitution. However, the Court concluded that she still had time to obtain such an order. As noted above, she has now done so.

### 2. Issues Presented by District Court Remand Order

The District Court remand order directed the Court to determine: (1) when the Bank became aware of the Jameson Agreement and (2) whether the Bank's foreclosure sale constituted a willful violation of the automatic stay in Mr. Dawson's chapter 7 case. For the reasons stated in the Legal Issues Memo, the Court concluded that insufficient evidence had been presented by Mr. Dawson to establish when the Bank became aware of the Jameson Agreement. As a consequence, Mr. Dawson failed to prove that the Bank's February 8, 1996 foreclosure sale constituted a willful violation of the automatic stay.

Although the evidence established that the Bank had knowledge that Mr. Dawson had filed a new bankruptcy petition prior to conducting its February 8, 1996 foreclosure sale, there was no evidence that the Bank learned that Mr. Dawson claimed an interest in the Home pursuant to the Jameson Agreement until March 1, 1996. However, the Court concluded that the Bank's failure to rescind its foreclosure sale until August 8, 1996, a little over five months after learning of this claim, did constitute a willful violation of the automatic stay. Since this establishes a new, and much longer, period during which the Bank violated the automatic stay, the

Court must redetermine the amount of damages incurred by Mr. Dawson as a result of the Bank's violation.

### 3. Issue Presented by Court of Appeals Remand Order

The Court of Appeals remand order directed the Court to determine whether Mr. Dawson is entitled to emotional distress damages, applying the correct legal standard.[6] For the reasons stated in the Legal Issue Memorandum, the Court has now concluded that he is entitled to such damages. The Court found that the circumstances were such that any reasonable person would have suffered serious emotional distress as a result the Bank's conduct.

## B. REMAINING ISSUES TO BE DETERMINED

The remaining issues to be determined relate to the amount of the damages to be awarded to Mrs. Dawson as the surviving spouse of Mr. Dawson as a result of the Bank's willful violation of the automatic stay. As discussed above, this matter has been fully briefed, and the parties agreed to rely on the declarations and other documentary evidence already in the record.

In her brief, Mrs. Dawson identified the following categories of Mr. Dawson's damages claim: (1) emotional distress damages, (2) special damages, (3) attorneys' fees and (4) punitive damages. Each of these categories is discussed below.

### 1. Emotional Distress Damages

Mrs. Dawson asserts that Mr. Dawson first learned that the Bank had foreclosed when six realtors appeared to inspect the

---

**6.** The Court of Appeals Remand Order also directed the Court to consider, if appropriate, whether Mr. Dawson was entitled to attorneys' fees and costs for causing the Bank to reduce its proof of claim. This issue is discussed at the conclusion of this memorandum.

Home. Thereafter, on February 21, 1996, he was served with a three day notice to quit, and on March 1, 1996, an unlawful detainer complaint. She asserts that he suffered acute fear during this period that he and his family would be homeless. She asserts that, as a result of this fear, he was required to obtain physical therapy to relieve muscle tension, and his doctor required him to increase the dosage of his high blood pressure medicine. She also asserts that he began to drink excessively and ultimately was required to obtain help with this problem from the Veteran's Administration and Alcoholics Anonymous.

The Court originally found that the foreclosure sale did not violate the automatic stay because Mr. Dawson did not have an interest in the Home on the day of the sale: i.e., February 8, 1996. This determination was reversed by the District Court. The Court was directed to reconsider whether the February 8, 1996 foreclosure sale constituted a willful violation of the automatic stay. However, as set forth in the Legal Issues Memorandum, on remand, because insufficient evidence was presented that the Bank knew that Mr. Dawson claimed an interest in the Home on February 8, 1996, the Court found that foreclosure sale did not constitute a willful violation of the automatic stay, which would entitle Mr. Dawson to damages.

■ However, as the Court previously found, in its original decision, the Bank did willfully violate the automatic stay protecting Mr. Dawson's possessory interest in the Home by serving the three day notice on February 21, 1996 and continued to violate it through March 14, 1996 at which time the unlawful detainer action was dismissed. In addition, as set forth in the Legal Issues Memorandum, on remand, the Court concluded that the Bank willfully violated the automatic stay by failing to rescind the February 8, 1996 foreclosure sale for a little over five months once it learned, on March 1, 1996, that Mr. Dawson claimed an interest in the Home. Thus, Mr. Dawson is also entitled to damages for the period from March 1, 1996 through August 8, 1996.[7]

Mrs. Dawson cites emotional distress awards in other cases involving willful violations of the automatic stay to guide the Court in determining the amount of distress damages to award. She notes that, in *In re Flynn*, 185 B.R. 89, 91 (S.D.Ga. 1995), a district court affirmed an award of $5,000 based on an improper freeze on the debtor's bank account by the Internal Revenue Service which required the debtor to cancel her son's birthday party and resulted in embarrassment when one of her checks bounced in a supermarket checkout line. She also cites *In re Stinson*, 295 B.R. 109, 119 (9th Cir. BAP 2003), in which the trial court awarded $13,000 in emotional distress damages based on a creditor's willful violation of the automatic stay by obtaining a default judgment against the debtor. Mrs. Dawson argues that the fear of homelessness caused by the Bank's conduct is much more acute than any distress that could have been caused by the conduct in either of these cited cases. Therefore, the damages should be much more

7. Given the Court's original determination that Mr. Dawson did not hold an interest in the Home when the foreclosure sale was conducted, it may seem unfair to hold the Bank liable for damages for a willful stay violation under these circumstances. However, the Bank could have protected itself from this liability by seeking a Court determination of the issue. If the Bank had done so promptly and had the Court determined that Mr. Dawson had no interest in the Home at the time of the foreclosure sale, the Court would not now find that the Bank willfully violated the automatic stay by failing to rescind the foreclosure sale even though the Court's determination was later reversed by the District Court.

substantial. She suggests $90,000 which she calculate as $500 per day.

The Bank responds that no emotional distress damages should be awarded. It asserts that there is no proof of the causal connection between the alleged damages and the stay violation as required. Clearly, Mr. Dawson had problems other than the Bank's unwitting stay violation. His defaults on his deeds of trust and his numerous bankruptcies evidence his serious and long standing financial problems. In addition, the Bank notes that, in discovery, Mr. Dawson admitted that he could not remember when his drinking problem started. The Bank contends that the evidence submitted suggests that his drinking problem began prior to the events at issue here.

The Bank also argues that, given its prompt dismissal of its unlawful detainer action, the Court should not accept Mr. Dawson's self-serving assertion that he lived in constant fear of being evicted for six months. Moreover, his delay in bringing this action suggests that he did not consider his injury substantial. The Bank asserts that, if Mr. Dawson had been seriously distressed about the Bank's failure to rescind the sale, he would have requested Court assistance.

Finally, the Bank notes that, originally, Mr. Dawson only requested $20,000 in emotional distress damages. According to the Bank, there is no explanation for this greatly increased demand.[8] Moreover, according to the Bank, even the original amount requested is excessive. The Bank notes that, in *In re Wagner*, 74 B.R. 898, 900–05 (Bankr.E.D.Pa.1987), in which a creditor burst into the debtor's house one

evening, turned off the light, and threatened to shoot him, the court only awarded $100 in emotional distress damages. In another case, in which the creditor's conduct was much more egregious, only $1,000 was awarded. *See In re Carrigan*, 109 B.R. 167, 170 (Bankr.W.D.N.C.1989).

Mrs. Dawson responds that the Court has already determined causation by determining that the circumstances were such that a reasonable person would have suffered emotional distress damages. Therefore, the only issue is the appropriate amount of the damages. She notes that the Bank previously argued that Mr. Dawson had waited too long to assert his claim and that argument was rejected by the Court. She explains that the increased amount of the demand is based on the much longer stay violation found by the Court on remand.

■ Having considered the arguments set forth above, the Court concludes that Mrs. Dawson is entitled to an award for Mr. Dawson's emotional distress damages in the amount of $20,000. The Court agrees with Mrs. Dawson that, by finding that the circumstances were such that any reasonable person similarly situated would have suffered serious emotional distress damages, the Court found that the causation element had been satisfied. The Court also finds unpersuasive the Bank's argument that Mr. Dawson's delay in filing this action indicates that he did not suffer serious emotional distress. More likely, he was not able, during this time, to afford to hire an attorney to represent him in this matter. As discussed below, the attorney he ultimately did find to represent him did

8. The Bank also contends that the Court should offset any damages award by the $25,000 or more in attorneys' fees it did not include in its payoff demand in 2002 when the Home was sold. The Court finds this contention without merit. No evidence has been presented of the Bank's attorneys' fee claim. More important, the Bank waived this claim when it failed to include it in its payoff demand.

so on a contingent fee basis after March 1999.

■ The Bank is correct that Mr. Dawson clearly had other serious pressures on him at the time of the Bank's stay violation that likely contributed to his emotional distress. However, to establish causation, Mrs. Dawson is not required to prove that the Bank's stay violation was the sole cause of Mr. Dawson's emotional distress. Causation requires only proof that the offending conduct was a substantial factor. *See In re Brown*, 217 B.R. 857, 862 (Bankr. S.D.Cal.1998), citing *Field v. Mans*, 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)(discussing causation under § 523(a)(2)(A)). The Court is persuaded that the Bank's attempt to evict Mr. Dawson coupled with its five month delay in rescinding the void foreclosure sale was a substantial factor contributing to Mr. Dawson's emotional distress.

However, the $70,000 in emotional distress damages now requested by Mrs. Dawson seems excessive given the fact that the Bank made no further efforts to evict the Dawsons from their home after February 14, 1996. The case most closely on point to this one factually is *In re Rosa*, 313 B.R. 1 (Bankr.D.Mass.2004). In *Rosa*, the City of Chicopee willfully violated the automatic stay by publishing a notice of tax taking against the debtor's property in a local newspaper, by recording a tax taking of the debtor's property, and by sending the debtor a notice of impending foreclosure. In each instance, the City rescinded its action promptly after the debtor's attorney complained. The Court awarded the debtor $2,000 in emotional distress damages. *Id.* at 7.

Given the Bank's delay in rescinding the foreclosure sale, but bearing in mind as well that Mr. Dawson's emotional distress was caused in part by other problems, a sum of $20,000 appears adequate to compensate for Mr. Dawson's emotional distress damages resulting from the Bank's conduct during this period.

### 2. Special Damages

■ In its original decision, the Court awarded Mr. Dawson special damages of only $200.[9] This amount represented the attorneys' fees paid to Mr. Dawson's bankruptcy counsel for obtaining the dismissal of the unlawful detainer action. Mrs. Dawson now requests an additional award of attorneys' fees of $800, representing the time allegedly spent by Mr. Dawson's bankruptcy counsel, persuading the Bank to rescind the foreclosure sale.

The Bank did not comment on this request. The Court has reviewed the record with respect to the request. It appears that the only evidence that was submitted in support of the original request for Mr. Dawson's bankruptcy counsel's fees is Mr. Dawson's declaration. No declaration was submitted by the bankruptcy counsel herself, detailing the work performed and the time spent. In his declaration, Mr. Dawson stated that he paid his bankruptcy counsel $1,500 for her services in connection with the bankruptcy.

The request for an additional $800 is based on four hours of Mr. Dawson's bankruptcy counsel's services. During this time, according to Mr. Dawson, his counsel sent two letters and made one or two phone calls to the Bank. This does not

---

**9.** The briefs refer to the amount of damages in this category as $2,307.60. However, the figure of $2,307.60 represents the total of the $200 in attorneys' fees incurred to obtain the dismissal of the unlawful detainer action and $2,107.60 initially awarded for counsel's fees during the initial phase of this proceeding. The latter fees are discussed in a separate section below.

seem like four hours worth of work. Based on the evidence presented, the Court will award an additional $400 for bankruptcy counsel's services.

In its original decision, the Court denied Mr. Dawson's request for the $5,400 in rent paid during the period prior to the Bank's rescission of its foreclosure sale. Since the Court originally found that the foreclosure sale did not violate the automatic stay, it concluded that these payments did not qualify as damages under 11 U.S.C. § 362(h).

The Court also denied Mr. Dawson's request for $1,440 in damages for the cost of Mr. Dawson's physical therapy. Based on the evidence provided, the Court accepted as true that Mr. Dawson actually incurred these costs. However, it found it to be more likely than not that Mr. Dawson's physical distress was the result of Mr. Dawson's overall financial difficulties, not the result of the Bank's brief stay violation. Both rulings must be reconsidered in view of the stay violation of a much longer duration.

Mrs. Dawson argues that, based on the District Court's ruling, the Court should now award these damages. She notes that the only evidence before the Court is that the Bank's stay violation caused Mr. Dawson to incur these debts. The Court should accept Mr. Dawson's sworn statements as true since the Bank chose not to cross-examine him. She asserts that there is no evidence that Mr. Dawson had any financial difficulties other than those with the Bank.

The Bank contends that the Court's denial of special damages other than the $200 already awarded is final. Thus, the only issue that the Court is empowered to revisit is Mrs. Dawson's right to emotional distress damages as a result of the Bank's delay in rescinding the February 8, 1996 foreclosure sale. Moreover, the Bank takes issue with Mrs. Dawson's contention that there is no evidence that Mr. Dawson had any financial difficulties other than with the Bank. It contends that the Dawson's five bankruptcy cases and the foreclosure by the Dixons, the holders of the Second Deed of Trust, contradict that assertion.

The Bank also argues that the assertion that Mr. Dawson rented a separate residence for six months out of fear that his family would be homeless is not credible. It reasons that the fact that Mrs. Dawson stayed in the Home makes it more likely that the Dawsons separated during this period. In response, Mrs. Dawson notes that the Bank's stay violation need not have been the sole cause, merely a substantial factor.

The Court will award the $5,400 in rent and $1,440 in physical therapy debts requested by Mrs. Dawson. The Court is persuaded that, more likely than not, the Bank's delay in rescinding the February 8, 1996 foreclosure sale was a substantial factor in causing these expenses to be incurred. The Bank is correct that there is ample evidence that Mr. Dawson had financial problems other than those with the Bank. Moreover, his financial problems with the Bank in general must be distinguished from his concern over the Bank's failure to rescind the foreclosure sale.

However, the only evidence before the Court is Mr. Dawson' s sworn declaration that these expenditures were caused by the fear of losing the Home, based on the Bank's foreclosure sale and its delay in rescinding it. The Court is not bound to accept uncontradicted evidence as true if it is inherently implausible. However, the Court does not find Mr. Dawson's declaration inherently implausible. It is possible that he rented a separate residence due to marital difficulties. However, the fact that

Mrs. Dawson stayed in the Home is more likely the result of concern about leaving a house unattended. In sum, the Court will award special damages totaling $7,440 ($600 in attorneys' fees, $5,400 in rent, and $1,440 in physical therapy costs.)

### 3. Attorneys' Fees

Mrs. Dawson asks the Court to award her attorneys' fees for prosecuting this action. In its initial decision, the Court awarded Mr. Dawson only $2,107.60 of his counsel's fees for prosecuting the action. This amount represented one-twentieth of the fees requested. This percentage was based on the Court's calculation that Mr. Dawson had only prevailed on one of the twenty issues identified. Given the reversals by the District Court and Court of Appeals, both of which were in favor of Mr. Dawson, clearly, the attorneys' fee award must be increased. In addition, Mrs. Dawson is entitled to recover attorneys' fees incurred during the appellate and remand phases of the proceeding. *See In re Walsh*, 219 B.R. 873, 876 (9th Cir. BAP 1998); *In re Roman*, 283 B.R. 1, 5 (9th Cir. BAP 2002).

■■ The starting point for most fee awards is a determination of the lodestar amount: i.e., the number of reasonable hours spent multiplied by the attorneys' reasonable hourly rate. This lodestar amount may then be adjusted based on special circumstances in the case. *Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1998). Mrs. Dawson submits that the correct lodestar amount is $150,068 but contends that this should be adjusted upwards "to reflect counsel's success and contribution to the jurisprudence under section 362(h)."

The lodestar amount requested by Mrs. Dawson is based on blended hourly rates of $400 for lead counsel, Charles Dell'Ario ("Dell'Ario"), $300 for Jacques LeBoeuf ("LeBoeuf"), and $225 for Anthony V. Smith ("Smith"). Evidence has been provided that these are the market rates for attorneys with similar skills and experience. Mrs. Dawson contends that it is reasonable to make the award based on current hourly rates to compensate for the delay in payment. *See Missouri v. Jenkins*, 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1548 (9th Cir.1992).

Mrs. Dawson also contends that the hours upon which the fee request is based are reasonable in number given the work performed. She breaks the time spent down into five periods. She concedes that, during the initial period, close to fifty percent of the time was spent on accounting issues. She represents that she has excluded this time from her calculation. However, she asserts that she is entitled to her attorneys' fees for all of the other time spent. Either the issues litigated directly involved the stay violation or were "related" to it. *See Thomas v. City of Tacoma*, 410 F.3d 644, 650 (9th Cir.2005)(defining "related" as arising from a common core of facts or involving the same legal theories).

The Bank's threshold argument is that none of the fees requested for Mr. Dawson's litigation counsels' services are recoverable pursuant to 11 U.S.C. § 362(h). It notes that none of these fees were incurred to *remedy* the violation, since the Bank had rescinded the sale two years before the action was filed. Under similar circumstances, the Bank contends, in *In re McHenry*, 179 B.R. 165 (9th Cir. BAP 1995), the Ninth Circuit Bankruptcy Appellate Panel refused to award fees. As further authority, the Bank also cites In re *McLaughlin*, 96 B.R. 554, 561–562 (Bankr. E.D.Pa.1989) and *In re Skeen*, 248 B.R. 312, 319 (Bankr.E.D.Tenn.2000).

In addition, the Bank contends that none of the fees are recoverable because, after March 1999, the services were provided on a contingent fee basis. Thus, they cannot be viewed as Mr. Dawson's actual damages as required by 11 U.S.C. § 362(h). In support of this contention, the Bank cites *In re Hedetneimi*, 297 B.R. 837, 843 (Bankr.M.D.Fla.2003).

As a backup argument, the Bank also objects to the amount of the fees requested as excessive. The Bank's only challenge to the number of hours included in the lodestar is based on Mrs. Dawson's failure to exclude from the calculation the hours spent on accounting issues during the initial period. The Bank notes that Mr. Dawson was not the prevailing party on those issues. The Bank does not comment on the authority cited by Mrs. Dawson that fees for litigating "related" issues may be included in an award under 11 U.S.C. § 362(h).

The Bank also contends that the hourly rates are too high. It objects to the Court's using rates calculated on a current basis when most of the services were provided years ago. Again, the Bank does not respond to Mrs. Dawson's argument, supported with case authority, that this methodology is proper where payment has been delayed substantially. The Bank also contends that the Court's previous determination that $200 is a reasonable hourly rate for the services provided is now final and not subject to alteration.[10]

In response, Mrs. Dawson notes that the Bank cited *McHenry* to the Court unsuccessfully during the initial phase of the litigation for the proposition that attorneys' fees may not be recovered for seeking to recover damages under 11 U.S.C. § 362(h). To the contrary, she contends, under Ninth Circuit law, an award of attorneys' fees for these efforts is mandatory. *See In re Taylor*, 884 F.2d 478, 483 (9th Cir.1989); *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989). Moreover, she notes, under Ninth Circuit law, contingent fees are properly held to represent a party's actual damages. *See Gotro v. R & B Realty Group*, 69 F.3d 1485, 1488 (9th Cir.1995).

To the contrary, according to Mrs. Dawson, the contingent nature of the fees may justify an upward adjustment in the award. *See Widrig v. Apfel*, 140 F.3d 1207 (9th Cir.1998). Moreover, she notes, there is Ninth Circuit authority for awarding attorneys' fees as damages even when the services were provided on a pro bono basis. *See In re Stine*, 254 B.R. 244 (9th Cir. BAP 2000)(awarding damages under 11 U.S.C. § 523(d)).

With respect to the Bank's contention that the amount of the fees requested is excessive by comparison with the amount of Mr. Dawson's other damages, Mrs. Dawson quotes the following language from *Quesada v. Thomason*, 850 F.2d 537, 540 (9th Cir.1988): "[i]t is inappropriate ... to reduce the fees below the lodestar simply because the damages obtained are small." Not only does she contend that the full lodestar amount should be awarded, she asks that an additional $6,400, representing 14.5 hours by Dell'Ario and 4 hours spent by LeBoeuf preparing the reply paper, be added to the request.

Finally, Mrs. Dawson disagrees with the Bank's contention that the Court's determination of Dell'Ario's hourly rate may not be altered. She contends that, by directing the Court to revisit on remand the appropriate amount of attorneys' fees, the District Court authorized the Court to revisit the issue of the appropriate hourly

10. In fact, the Court based its initial award for Dell'Ario's services on a $250 hourly rate.

rates. The Court will address each of these issues in turn.

### a. Whether Attorneys' Fees May Be Recovered Under 11 U.S.C. § 362(h) For Action Solely To Recover Damages.

■ As noted above, the Bank contends that Mrs. Dawson may not recover any fees for the services of Dell'Ario and his associates in this action because the stay violation—i.e., the delay in rescinding the February 8, 1996 foreclosure sale—ceased long before this action was brought, and the purpose of this action was solely to recover damages. In support of this contention, it cites *McHenry, McLaughlin,* and *Skeen.* Mrs. Dawson notes that the Bank cited *McHenry* for this contention during the initial phase of this litigation and that the Court found the authority distinguishable. She notes that an award of actual damages, including attorneys' fees, is mandatory under 11 U.S.C. § 362(h), citing *Taylor,* 884 F.2d at 483 and *Bloom,* 875 F.2d at 227.

The Court has reviewed its Memorandum of Decision on damages filed on March 30, 2001 with respect to this issue. It finds that Mrs. Dawson is correct that, in that decision, the Court specifically addressed *McHenry,* distinguishing it on the ground that, in that case, the moving party had failed to establish any damages from the stay violation.[11]

■ The other two cases are distinguishable as well. In *Skeen,* the court also found that no damages had been incurred. However, it did not base its denial of fees solely on that ground. In a footnote, it acknowledged that there was conflicting authority as to whether attorneys' fees could ever be recovered when no other damages had been incurred. In dicta, it stated that the better view was that they could be. *See Skeen* at 321–22, n. 5. In *McLaughlin,* the court did not deny fees. It simply awarded less than the amount requested. *McLaughlin* at 563–64. Section 362(h) does not give an individual injured by a willful stay violation a blank check. The court must still find the attorneys' fees reasonable in amount. Thus, the Court rejects the Bank's first ground for its contention that no attorneys' fees should be awarded.

### b. Whether Attorneys' Fees Performed on a Contingent Fee Basis May Be Recovered as Damages Under 11 U.S.C. § 362(h).

■ The Bank's second ground for its contention that no fees are recoverable under 11 U.S.C. § 362(h) is that, after March 1999, the attorneys' services were performed on a contingent fee basis.[12] The sole authority cited for this proposition is *In re Hedetneimi,* 297 B.R. 837, 843 (Bankr.M.D.Fla.2003). In *Hedetneimi,* the court held that it could award attorneys' fees to the debtor for the willful stay violation despite the fact that the debtor had not incurred any damages. However, it refused to do so where the services had been provided on a pro bono basis.

Mrs. Dawson contends that, in the Ninth Circuit, attorneys' fees are recoverable as actual damages even if the litigant is not

---

**11.** The Court would have expected the Bank's counsel at least to note that he was requesting reconsideration of this previously decided issue.

**12.** Mrs. Dawson does not dispute the factual basis for this argument. The nature of the agreement has not been explained: i.e., whether recovery was to be had on a percentage basis from any award or whether fees could only be recovered based on any amount of fees awarded by the Court. The Court does not believe that this ambiguity should affect its decision.

personally liable for them. In support of this position, she cites *Widrig v. Apfel,* 140 F.3d 1207 (9th Cir.1998), *Gotro v. R & B Realty Group,* 69 F.3d 1485, 1488 (9th Cir.1995), and *In re Stine,* 254 B.R. 244 (9th Cir. BAP 2000).

The Court finds *Widrig* and *Stine* distinguishable. Although both cases involve an award of attorneys' fees to successful litigants despite the fact that they were represented on a pro bono or contingent fee basis, neither involved a statute that spoke in terms of an award of "actual damages, including attorneys' fees" as does 11 U.S.C. § 362(h). *See Widrig* at 1209, n. 3 (awarding attorneys' fees under 42 U.S.C. § 406(b)(1)); *Stine* at 249 (awarding attorneys' fees under 11 U.S.C. § 523(d)).

*Gotro,* on the other hand, does involve a statute that uses a similar phrase: i.e., "any actual expenses, including attorneys' fees, incurred as a result of the removal." *See* 28 U.S.C. § 1447(c). The *Gotro* court concluded that this language was not meant to preclude the recovery of attorneys' fees performed on a contingent fee basis. Rather, it was intended to indicate that attorneys' fees were required even in cases where the other party's conduct did not warrant the imposition of punitive damages or Rule 11 sanctions. *Id.* at 1487–88. The structure of 11 U.S.C. § 362(h) leads the Court to reach the same conclusion. Thus, the Court finds without merit as well the Bank's second ground for denial of all attorneys' fees.

### c. Allocation of Fees for Unrelated Issues

As noted above, Mrs. Dawson has broken down the attorneys' fee request into five categories as follows: (1) the initial liability phase, (2) the initial damages phase, (3) the appeal to the District Court, (4) the appeal to the Ninth Circuit, and (5) the remand proceedings. Mrs. Dawson concedes that not all of the time spent may serve as a basis for attorneys' fees under 11 U.S.C. § 362(h), only that time spent dealing with issues relating to the stay violation or "related" issues.

According to Mrs. Dawson, during the initial liability phase; 82.75 hours was spent by Dell'Ario and 137.50 hours was spent by Smith. She contends that no allocation is appropriate for the 12.75 hours spent by Dell'Ario successfully resisting the Bank's motion to dismiss the entire action. The Court agrees. She suggests that it is appropriate to deduct fifty percent of the remaining time as an allocation for the unrelated issues. This leaves an additional 35 hours of Dell' Ario's time and 68.75 of Smith's time. Thus, Dell'Ario's time would total 47.75 hours and Smith time 68.75 hours.

Mrs. Dawson concedes that some of the time included in this calculation does not directly relate to the stay violation. However, she contends that recovery may be had for "related" claims which are closely related to the claims for which recovery is authorized. In support of this contention, she cites *Thomas v. City of Tacoma,* 410 F.3d 644, 650 (9th Cir.2005). As noted above, the Bank did not address this contention.

The *Thomas* court held, relying on *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), that " '[w]here the lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.' " *Thomas* at 649, quoting from *Hensley* at 440, 103 S.Ct. 1933. It defined "related" claims as those arising from a " 'common core of facts' " or " 'based on related legal theories.' " *Thomas* at 649 & n. 5, quoting from *Webb v. Sloan,* 330 F.3d 1158, 1168 (9th Cir.2003).

■ The Bank notes that on remand the Court found that it did not willfully violate the automatic stay by conducting the February 8, 1996 foreclosure sale. As a consequence, the Bank contends, Mrs. Dawson's attorneys' fees for litigating this issue are not recoverable under 11 U.S.C. § 362(h). The Court disagrees.

What the Bank ignores in making this argument is that this issue was inextricably intertwined with the related issue on which Mr. Dawson did prevail: i.e., whether the Bank's delay in rescinding the February 8, 1996 foreclosure sale constituted a willful violation. No allocation is possible or appropriate of the time spent on these two "related" issues.

■ The Bank also objects to Mrs. Dawson's failure to exclude any attorneys' fees for the appeal to the District Court. It contends that not all of the issues addressed in that appeal involved the willful stay violation nor did Mr. Dawson prevail on those other issues. The only issue mentioned in this respect is whether Mr. Dawson could be required to make the payments that accrued on the First Deed of Trust during the period after the February 8, 1996 foreclosure sale through the rescission of the sale on August 8, 1996. Mr. Dawson contended he should not be required to do so.[13]

Mrs. Dawson contends that the time spent on this issue was minimal. The Bank does not suggest an appropriate allocation. Since the issue was litigated elsewhere, the Court is ill placed to make an allocation. However, the Court is familiar with the issue. It is neither factually nor legally complex. Thus, the Court concludes that no allocation should be made for the time spent during the appeal to the District Court with respect to this issue.

In light of the authority discussed above and considering the outcome of the issues as they appear at this stage of the litigation, the Court also concludes that it is appropriate to allocate fifty percent of the attorneys' fees incurred after the successful opposition of the motion for summary judgment to issues dealing with the stay violation or related to it. Thus, the lodestar number of hours suggested by Mrs. Dawson for all five phases of the litigation is accepted.[14]

#### d. Appropriate Hourly Rate

■ The second half of the lodestar calculation is a determination of the hourly rates to be applied. During the initial damages phase of this proceeding, Mr. Dawson requested attorneys' fees at the rate of $250 per hour for Dell'Ario's time and $200 per hour for Smith's time. The Court awarded fees at this rate although, based on Mr. Dawson's lack of success at that stage on all but one of the issues, the percentage of the fees requested that was awarded was very small. The District Court affirmed the use of these rates and this issue does not appear to have been appealed to the Ninth Circuit.

Mrs. Dawson now asks the Court to apply current market rates in calculating the lodestar. She asks that Dell'Ario's time be allowed at the rate of $400 per hour, LeBoeuf's at the rate of $300 per

---

**13.** During the initial liability phase, the Court held that he was required to make these payments. This issue was affirmed by the District Court and was not appealed further.

**14.** This includes the additional time requested by Mrs. Dawson related to preparation of the reply. Although the Bank has not had an opportunity to respond to this request, clearly Mrs. Dawson is entitled to recover these fees under the circumstances, and the amount of the time spent appears reasonable.

hour, and Smith's at the rate of $225 per hour. As noted above, the Court's use of current market rates to adjust for delay in payment is supported by Supreme Court and Ninth Circuit authority. *See Missouri v. Jenkins,* 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *Davis v. City and County of San Francisco,* 976 F.2d 1536 (9th Cir.1992).

The Bank objects to the requested rates. It notes that Dell' Ario admits that his rates ranged from $235 to $275 for almost half of the eight years of this litigation. It contends that to allow the fees at the rate requested by Mrs. Dawson would result in a grossly excessive award. In response, Mrs. Dawson notes that the Bank offers no evidence that the rates requested do not represent the prevailing rates for like services.

The Court concludes that the rates requested by Mrs. Dawson should be employed. The Court believes that, given the extremely lengthy delay in payment, it is appropriate to make an award based on current market rates. The evidence presented by Mrs. Dawson that the rates requested represent the current market rates is sufficient and uncontradicted. At the same time, given the Court's use of this methodology, it does not find it appropriate to increase the lodestar to reflect the contingent nature of the representation.

### e. Attorneys' Fee Award

■ The Court is now in a position to calculate the amount of the attorneys' fee award. As set forth above, Mrs. Dawson broke down the time spent by phase of the proceeding and by attorney's time. The fees allowed for each such phase and each such attorney's time are set forth below:

**Phase I Initial Liability Phase**

| Attorney | Hours | Hourly Rate | Fees Allowed |
| --- | --- | --- | --- |
| Dell'Ario | 47.75 | $400 | $ 19,100.00 |
| Smith | 68.75 | 225 | 15,468.75 |
| | | Subtotal | $ 34,568.75 |

**Phase II Initial Damages Phase**

| Attorney | Hours | Hourly Rate | Fees Allowed |
| --- | --- | --- | --- |
| Dell'Ario | 12.75 | $400 | $ 5,100.00 |
| Smith | 17.75 | 225 | 3,993.75 |
| | | Subtotal | $ 9,093.75 |

**Phase III Appeal to District Court**

| Attorney | Hours | Hourly Rate | Fees Allowed |
| --- | --- | --- | --- |
| Dell'Ario | 59.25 | $400 | $ 23,700.00 |
| LeBoeuf | 5.5 | 300 | 1,650.00 |
| Smith | 47.25 | 225 | 10,631.25 |
| | | Subtotal | $ 35,981.25 |

**Phase IV Appeal to Ninth Circuit**

| Attorney | Hours | Hourly Rate | Fees Allowed |
| --- | --- | --- | --- |
| Dell'Ario | 114.5 | $400 | $ 45,800.00 |
| LeBoeuf | 2.25 | 300 | 675.00 |
| | | Subtotal | $ 46,475.00 |

**Phase V Proceedings on Remand**

| Attorney | Hours | Hourly Rate | Fees Allowed |
| --- | --- | --- | --- |
| Dell'Ario | 60.75 | $400 | $ 24,300.00 |
| | 14.5 | 400 | 5,800.00 |
| LeBoeuf | 2 | 300 | 600.00 |
| | Total Attorneys' Fees | | $156,818.75 |

### 4. Punitive Damages

■ Finally, Mrs. Dawson asks the Court to award substantial punitive damages against the Bank in a multiple of the actual damages award. She does not contend that the Bank acted maliciously or oppressively. Rather, she contends that it acted recklessly or in callous disregard of Mr. Dawson's rights. This is sufficient to support the imposition of punitive damages. *In re Bloom,* 875 F.2d 224, 228 (9th Cir.1989).

■ In its original decision, the Court denied Mr. Dawson's request for punitive damages. It found that the stay violation was not egregious. However, the Court based this ruling on its belief that the only stay violation was the filing of the unlawful detainer action. Given the Court's decision on remand that the Bank's delay in rescinding the void foreclosure sale was also a willful stay violation, this issue must be revisited.

Mrs. Dawson contends that the evidence reflects that the Bank knew that the February 8, 1996 foreclosure sale was void by

early March 1996 but callously delayed rescinding the sale until early August. She bases this contention on an internal Bank memorandum dated March 7, 1996 stating: "If Bankruptcy Counsel is unable to validate our Trustee's Sale, we will proceed as directed in the Bankruptcy order." The Bank relies on this same internal memorandum in opposition to the request for punitive damages.

The Court agrees with the Bank that the internal memorandum argues against the imposition of punitive damages. As the Court reads it, the memorandum reflects two things: (1) that the Bank recognized that Mr. Dawson claimed the foreclosure sale was void but disagreed and (2) that it intended to have its bankruptcy counsel seek a determination of this contested issue. Clearly, that did not happen, and the Bank's failure to ensure that it did constitutes negligence. However, the Court does not believe that it evidences callous disregard.

Moreover, having initially concluded that the February 8, 1996 foreclosure sale did not violate the automatic stay, the Court is unable to conclude that the Bank clearly knew that it did so. Mr. Dawson was no longer on title to the Home at the time of the sale. His claim of an equitable interest was based on the Jameson Agreement which was never recorded. As discussed in the Legal Issues Memo, there is no evidence that Mr. Dawson sent a copy of that agreement to the Bank in March 1996 or that he even explained on what he based his claim of an interest in the Home.

■ One of the purposes of punitive damages is to prevent future misconduct. *Dang v. Cross,* 422 F.3d 800, 807 (9th Cir.2005). The misconduct displayed here was the Bank's failure to promptly seek a Court determination of whether, under ambiguous circumstances, its actions violated the automatic stay. The Court is confident that the substantial actual damages imposed on the Bank pursuant to this decision will adequately accomplish the deterrence purpose without the need for the imposition of punitive damages as well.

### 5. Attorneys' Fees For Reduction in Amount of Proof of Claim.

In its opinion, the District Court noted that, after this adversary proceeding was filed, the Bank amended it proof of claim to reduce the amount of the claim by approximately $15,000. The District Court acknowledged that this issue would not appear to be within the scope of a claim for attorneys' fees under 11 U.S.C. § 362(h). However, the District Court directed the Court to consider whether Mr. Dawson was entitled to attorneys' fees for services expended persuading the Bank to amend its claim and, if so, to determine the appropriate amount of such attorneys' fees. Neither party has addressed this issue on remand, and the Court considers it waived, at least as a part of this proceeding.

### CONCLUSION

The Court finds and concludes that the Bank is liable to Mrs. Dawson for the following amounts:

1. $20,000 in emotional distress damages;

2. $7,440 in special damages, consisting of $600 in attorneys' fees for the services of Mr. Dawson's bankruptcy counsel, $5,400 in rent, and $1,440 in physical therapy costs;

3. $156,818.75 in attorneys' fees.

No punitive damages will be awarded. Counsel for Mrs. Dawson is directed to submit a proposed form of judgment in accordance with this decision.